UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

KENNETH MOSHOS,

       Plaintiff,

vs.

SOUTHWEST OHIO REGIONAL
COUNCIL OF CARPENTERS
PENSION FUND, *et al.*,

       Defendants.

Case No. 3:24-cv-165

District Judge Michael J. Newman
Magistrate Judge Peter B. Silvain, Jr.
(mediation referral)

---

**ORDER: (1) DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. No. 18); (2) DENYING
WITHOUT PREJUDICE DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER
OF LAW ON THE ADMINISTRATIVE RECORD (Doc. No. 19); (3) REFERRING THIS
CASE TO MAGISTRATE JUDGE PETER B. SILVAIN, JR. FOR THE PURPOSE OF
HOLDING ONE OR MORE MEDIATION CONFERENCES; AND (4) REQUIRING
THE PARTIES TO PARTICIPATE IN GOOD FAITH IN THE MEDIATION
CONFERENCE(S)**

---

Plaintiff Kenneth Moshos is a carpenter.  Doc. No. 1 at PageID 2.   He brings this ERISA[1]

civil enforcement action through counsel to recover pension benefits allegedly owed him under

the terms of an ERISA plan.[2]  Doc. No. 1.  Moshos claims Defendants wrongfully declined to pay

him the full amount of the "normal retirement benefits" he accrued under an ERISA-covered

pension plan, the Southwest Ohio Regional Carpenters Pension Plan, "as amended and restated

effective January 1, 2014" ("the Plan").  *See* Doc. Nos. 1, 14-1 at PageID 481-563.  Defendants

are the Southwest Ohio Regional Council of Carpenters Pension Fund ("Pension Fund") and the

---

[1] The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq*.

[2] An ERISA plan participant or beneficiary may bring a civil action "to recover benefits due him under the
terms of his plan [or] to enforce his rights under the terms of the plan[.]"  29 U.S.C. § 1132(a)(1)(B).

Board of Trustees for the Pension Fund ("Board of Trustees").  Doc. No. 1.  The Board of Trustees is the Plan "'administrator,' as that term is used in ERISA."  Doc. No. 14-1 at PageID 487.

The case is before the Court on Moshos's motion for judgment on the administrative record (Doc. No. 18), Defendants' cross motion for judgment as a matter of law on the administrative record (Doc. No. 19), and the administrative record (Doc. No. 14).  The parties have filed memoranda in opposition (Doc. Nos. 20, 21) and a reply (Doc. Nos. 23, 24).  The parties' cross motions are ripe for review.

### I.  Background[3]

During Moshos's employment as a carpenter, he was a member of the Southwest Ohio Regional Council of Carpenters.  *See* Doc. No. 14-1 at PageID 336-41.

On or around March 30, 2009, when Moshos was 49 years old, he received a letter from the Pension Fund's Pension Department informing him "[he had] accrued a normal [monthly] retirement benefit payable at age 62 in the amount of $910.24.  An early retirement benefit in the [monthly] amount of $719.09 can be paid July 1, 2014."  Doc. No. 14-1 at PageID 336; *see id*. at PageID 337, 496-98.  Under the terms of the Plan in effect in March 2009, Moshos's early retirement date was the first month after he turned age 55.  *Id.* at PageID 411.  Moshos did not choose to retire in 2009.

Almost five years later, on June 3, 2014 when Moshos was age 54, he received a letter from the Pension Fund's Pension Department explaining, "[he had] accrued a normal [monthly] retirement benefit payable at age 62 in the amount of $968.46.  An early retirement benefit in the

---

[3]  The following background is based on the administrative record.

[monthly] amount of $482.75 can be paid on July 1, 2014."[4]  *Id.* at PageID 339.  Moshos elected

to retire and began drawing early retirement benefits.  *Id.* at PageID 339-46.  Starting on July 1,

2014, he received five monthly payments of $482.75, totaling $2,413.75.  *Id.* at PageID 353, 391.

The Pension Fund described Moshos's early retirement benefits as a "Single Life Annuity: $482.75

per month, payable for life."  *Id*. at PageID 353.

Review of the Plan reveals that the amount of Mosho's early retirement was lower than his

normal retirement benefit because the Plan, Section 3.2, provides in part, "For retirements with a

benefit commencement date on or after January 1, benefits shall be reduced based on actuarial

equivalent reductions from the Participant's Normal Retirement Date."  *Id*. at PageID 498.  The

Plan defines the "actuarial value" of actuarial equivalent reductions as "an amount or series of

amounts of value determined by the assumptions in Appendix I."[5]  *Id*. at PageID 486.

However, Moshos's early retirement benefits were soon suspended under the terms of the

Plan after he began working again as a carpenter.[6]  *See id.* at PageID 522.  The pertinent Plan

language states:

> …if an individual who is receiving a monthly benefit (other than a Disability Retirement Benefit) that commenced on or after April 30, 2010 from the Plan works in the industry covered by the Plan (regardless of where such work occurs or the number of hours worked in such industry), such benefits shall be suspended until such person's Normal Retirement Date.

*Id.*

---

[4] Under the terms of the Plan, Moshos was eligible for early retirement on this date because he was over age 50, he had not reached his normal retirement age, and he had completed more than five years of vesting service.  *See* Doc. No. 14-1 at PageID 339, 489.

[5] Appendix I, in part, specifies the per annum interest and designates the "UP - 1984 Mortality Table" for use in calculating "actuarial value."  Doc. No. 14-1 at PageID 537.

[6] When Moshos's application for early retirement benefits was granted, he was notified, "We must caution you that your right to receive these monthly pension benefits is conditioned upon your complete retirement from work at the trade.  If you return to work or in a related capacity, you will be subject to the Plan's Suspension of Benefits rules."  Doc. No. 14-1 at PageID 384.

On October 13, 2014, an individual acting as the "Administrator for the Board of Trustees" notified Moshos by letter that his early retirement benefits would be suspended beginning on December 1, 2014, as he had worked in disqualifying employment. *Id.* at PageID 355. Without an appeal or challenge by Moshos, his benefits were suspended on December 1, 2014. *See id.* at PageID 391. He had received a total of five monthly payments ($482.75 each) of his early retirement benefits, totaling $2,413.75. *Id*.

Moshos's early retirement benefits remained suspended for approximately six years and seven months (from December 1, 2014 to July 1, 2021).

As he neared his normal retirement age of 62, he applied for normal retirement benefits.[7] *Id.* at PageID 357-58. At the time of his application, his early retirement benefits were still suspended. *See id*. at PageID 384. On March 29, 2021, the Pension Fund's "Pension Coordinator" informed Moshos by letter that his application for a pension benefit had been "approved" but only for the lower amount of his early retirement benefit rather than the higher amount of his normal retirement benefits. *See id*. The Pension Coordinator noted that the amount of Moshos's early retirement life benefits was $482.75, and "with MPRA Reduction,"[8] equaled $444.14 per month. *Id*. Obviously this amount was much less than the amount of his normal retirement benefits—$968.46 per month—he applied to receive. *Id*.

In May 2021, Moshos wrote to the Board of Trustees challenging the decision to pay him his early retirement benefits rather than his normal retirement benefits. *Id.* at PageID 389-90. He argued, under ERISA, "any suspension of benefits does not preclude me from receiving my normal

---

[7] The Pension Plan defines a participant's "normal retirement age" as "the later of age 62 or the fifth anniversary of the participation commencement date." Doc. No. 14-1 at PageID 492, Section 1.27.

[8] MPRA refers to the Multiemployer Pension Reform Act of 2014. *See* Doc. No. 14-1 at PageID 569.

retirement benefit after attaining normal retirement age." *Id.* at PageID 389 (citing ERISA and "[29] C.F.R. § 2530.203-3").[9]

On June 17, 2021, after the Board of Trustees met, it sent Moshos a letter denying his appeal. *Id.* at PageID 391-93. The letter stated in part:

> 2. [The Pension] Plan Provisions … under the "Suspension of Benefit" Rules for members who retired and commenced benefits after April 30, 2010 state: "a member who has retired before Normal Retirement age and who completes any hours of service in Disqualifying Employment shall have his benefit suspended until Normal Retirement Age."
>
> 3. Discussion: You retired on July 1, 2014 under an Early Retirement at age 55 and a Single Life benefit. Your benefit was suspended due to work in disqualifying employment November 1, 2014. You are 62 as of ____, 2021 and eligible to resume pension benefit payments effective July 1, 2021. You retired on July 1, 2014 under an Early Retirement at age 55 and a Single Life benefit. Your benefit was suspended due to work in disqualifying employment [on] November 1, 2014. You are 62 as of June 28, 2021 and eligible to resume pension benefit payments effective July 1, 2021.
>
> 4. Conclusion: Resumption of your benefit under a Normal Retirement full accrued benefit calculation is denied by the Board of Trustees. Your benefit will resume effective July 1, 2021 under your original Early Retirement Single Life benefit calculation of $482.75 less MPRA benefit reduction (Plan change effective April 1, 2019) for an adjusted benefit amount of $444.14.

*Id.* at PageID 392-93.

Moshos sent additional correspondence to the Board of Trustees, asking several questions and again requesting payment of his normal retirement benefits. *Id.* at PageID 394-95. Moshos then filed this ERISA lawsuit on June 4, 2024, challenging the Board of Trustee's decision not to pay him the entire amount of his accrued normal retirement benefit. Doc. No. 1 at PageID 1.

---

[9] Moshos acknowledged that he owed the Plan $2,413.75, which the Plan had previously paid to him upon his early retirement in 2014. Doc. No. 14-1 at PageID 389.

## II.  Standard of Review

"ERISA was enacted to promote the interests of employees and their beneficiaries, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (citation modified) (citing *generally* 29 U.S.C. § 1001 (setting forth congressional findings and declaration of policy regarding ERISA)).

In a case challenging an ERISA plan administrator's denial of benefits, the Court reviews the denial *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id*. at 115.  If the plan gives the administrator such discretion, then the standard of review is arbitrary and capricious. *Durbin v. Columbia Energy Grp. Pension Plan*, 522 Fed. App'x 341, 344 (6th Cir. 2013).  In the present case, the parties agree that the arbitrary and capricious standard of review applies.[10]  Doc. No. 18 at PageID 598; Doc. No. 19 at PageID 612; Doc. No. 21 at PageID 636. The Court concurs because the Plan gave the administrator "discretionary authority" to determine Moshos's eligibility for normal retirement benefits and "to interpret the Plan."  Doc. No. 14-1 at PageID 516, ¶ 4.3; *see Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011).

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Farhner*, 645 F.3d at 342.  It is satisfied if a "plan administrator's decision 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine*

---

[10] Also, the parties do not dispute that the Pension Plan meets ERISA's definition of an "employee pension benefit plan" and is therefore governed by ERISA.  *See* 29 U.S.C. § 1002(2)(A); *cf. Wilson v. Safelite Group, Inc*., 930 F.3d 429, 434 (6th Cir. 2019) ("Congress purposefully designed [ERISA's] scheme so that 'employers can establish ERISA plans rather easily'" (citing *Int'l Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 297 (6th Cir. 1991))).

*Workers of Am. Health & Ret. Funds,* 929 F.2d 1140, 1144 (6th Cir. 1991)); *see McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064-65 (6th Cir. 2014); *Johnston v. Dow Emps. Pension Plan*, 703 Fed. App'x 397, 401 (6th Cir. 2017).

### III.  Analysis

Moshos does not challenge, and the parties do not disagree about, several conclusions. First, § 3.2 of the Plan allowed Moshos to retire early and receive the actuarial equivalent amount of his normal retirement benefits.  *Id*. at PageID 497-98.  Second, Moshos's early retirement benefits constituted a life annuity—"a monthly benefit payable for [his] lifetime."  *Id*. at PageID 339, 344.  Third, the later suspension of his monthly early retirement benefits, due to his disqualifying employment, was supported by Plan § 4.7.  *Id*. at PageID 521-23.

What remains at issue is Moshos's challenge to the Board of Trustee's ("the Board") decision at his normal retirement age (when the suspension of his early retirement benefits ended) to pay his early retirement benefits—*i.e.*, the actuarial equivalent of his normal retirement benefits ($482.75 per month)—rather than the full amount of his accrued normal retirement benefits ($968.46 per month).  Doc. No. 18 at PageID 600-01; *see also* Doc. Nos. 20, 23.  Moshos argues ERISA prohibits the forfeiture of his accrued normal retirement benefits caused by the Board's decision to pay his early retirement benefits at his normal retirement age of 62.  Doc. No. 18 at PageID 600-01.  For support, he relies on certain sections of the Plan; ERISA's nonforfeitability statute, 29 U.S.C. § 1053(a); and 29 C.F.R. § 2530.203-3(a).

Defendants contend the Board's decision to resume paying Moshos's early retirement benefits was not arbitrary and capricious because it resulted from a straightforward application of § 4.7 of the Plan and because ERISA, 29 U.S.C. §§ 1053(a)(1), 1054(c)(3); and 29 C.F.R. § 2530.203-3(a) support its decision.  Doc. No. 19 at PageID 612-18; Doc. Nos. 21, 24.

Upon careful review of the administrative record—including, but not limited to the Plan and the parties' cross motions and related memoranda—the Court finds that the Board of Trustees' decision to pay Moshos the actuarial equivalent of his normal retirement benefits, after the suspension of his early retirement benefits ended on his retirement date, fails to comply with 29 U.S.C. §§ 1053(a), 1054(c)(3), and an interpretive regulation, 29 C.F.R. § 2530.203-3(a).

### A. ERISA, 29 U.S.C. §§ 1053(a), 1054(c)(3)

Section 1053(a) states in part, "Each pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age[.]"[11] This statute "[g]enerally … prohibits a pension plan from failing to make payments to a participant who has reached the normal retirement age." *Whisman v. Robbins*, 55 F.3d 1140, 1145 (6th Cir. 1995).

However, ERISA contains an exception to this prohibition, in 29 U.S.C. § 1054(c)(3), which generally allows a plan to offer participants the option of retiring early.[12]  When a plan participant selects early retirement, the participant's "accrued benefit" in such cases "shall be the actuarial equivalent of such [normal retirement] benefit or amount[.]"  29 U.S.C. § 1054(c)(3). Applying § 1054(c)(3), Defendants correctly conclude, "Thus, [Moshos's] reduced Early

---

[11] Section 3.1 of the Plan addresses § 1053(a)'s nonforfeitability mandate by providing, "The Accrued [Normal Retirement] Benefit shall be totally nonforfeitable at a Participant's Normal Retirement Age and at all times." Doc. No. 14-1 at PageID 496.

[12] Section 1054(c)(3) states, "For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2)."

Retirement Benefit is his 'accrued benefit' permissibly expressed as an actuarial equivalent of his 'normal retirement benefit.'"  Doc. No. 24 at PageID 652 (quoting 29 U.S.C. § 1054(c)(3)).

Yet, this conclusion does not resolve Moshos's challenge to the Board's decision for two related reasons: First, as discussed below, *infra*, § III(B), ERISA's Suspension Regulation, 29 C.F.R. § 2530.203-3(a), applies to the Board's decision because it explains how ERISA's nonforfeitability statute and its exception in § 1054(c)(3) operate when a plan participant's (like Moshos's) early retirement benefits are suspended.  Second, the Board's decision to resume paying Moshos's early retirement benefits at his normal retirement age significantly reduced the total amount of early retirement benefits he will receive over his lifetime due to the six-year suspension of his early retirement benefits.

### B.  The Suspension Regulation

The Suspension Regulation provides in pertinent part:

> A plan may provide for the suspension of pension benefits which commence prior to the attainment of normal retirement age … to the extent (but only to the extent) that suspension of such benefits does not affect a retiree's entitlement to normal retirement benefits payable after attainment of normal retirement age, or the actuarial equivalent thereof.

29 C.F.R. § 2530.203-3(a).[13]  As is readily seen, the plain meaning of the Suspension Regulation presented the Board with two alternatives, once Moshos reached his normal retirement age: either pay (1) his normal retirement benefits or (2) "the actuarial equivalent thereof."  *Id*.  The second of these options is consistent with the Suspension Regulation's companion statute's use of "actuarial equivalent" language.  *See supra*, § III(A) n. 12 (quoting 29 U.S.C. § 1054(c)(3)).  Further, the Suspension Regulation aligns with ERISA's nonforfeitability provision, § 1053(a), by permitting

---

[13] Plaintiff notes, "[This] regulation interprets the express language of ERISA requiring that each pension plan 'shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.'"  Doc. No. 18 at PageID 601 (quoting 29 U.S.C. § 1053(a)).

the suspension of early retirement benefits before a participant's normal retirement age "to the extent (but only to the extent) … [the] suspension does not affect a retiree's entitlement" to either alternative (1) normal retirement benefits or (2) "the actuarial equivalent thereof." § 2530.203-3(a).

To understand these options, and the Board's choice of option 2, the Court turns to a recent Sixth Circuit case, *Reichert v. Kellogg Co*., __F.4th__, Nos. 24-1442, 24-5945, 2026 WL 734673, at *5 (6th Cir. 2026).  Because *Reichert* was so recently decided, the Court considers it without the benefit of briefing by the parties, which the Court intends to seek from the parties, if the case is not resolved by mediation, as will be explained below.  *See infra*, § IV.

*Reichert* provides insight into the meaning of the term "actuarial equivalent" as used in ERISA. To be sure, *Reichert* differs in significant ways from the instant case.  *Reichert* concerns a different provision of ERISA (§ 1055, addressing a plan's inclusion of a QJSA, Qualified Joint and Survivorship Annuity) at a different stage of the litigation (the pleading stage).  2026 WL 734673, **1-11.  Still, *Reichert* is instructive in its observation that "ERISA does not define or elaborate on the term 'actuarial equivalent[,]'" *id*. at *2, and in its recognition that "in the modern era—as the D.C. Circuit explained in a 2011 [ERISA case], '[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions.'"  *Id*. at *6 (quoting *Stephens v. U.S. Airways Grp.*, 644 F.3d 437, 440 (D.C. Cir. 2011)).

At present, and without the benefit of the parties' analysis, *Reichert's* discussion of "actuarial equivalent," as used in one statutory section of ERISA comfortably applies to its use and meaning in § 1054(c)(3) and the Suspension Regulation.  *See King v. St. Vincent's Hosp*., 502 U.S. 215, 221 (1991) ("[W]e … follow the cardinal rule that a statute is to be read as a whole,

10

since the meaning of statutory language, plain or not, depends on context, since the meaning of statutory language, plain or not, depends on context" (citing *Massachusetts v. Morash,* 490 U.S. 107, 115 (1989) (ERISA case recognizing, "'In expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy'")).

In the instant case, the Suspension Regulation provided the Board with the choice between what should have been equals or near equals. *See Reichert*, 2026 WL 734673, at *6 ("'[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions.'" (quoting *Stephens*, 644 F.3d at 440). Yet, in Moshos's circumstances, the choice was not between equals or near equals.

By the time Moshos reached his retirement date in 2021, he had not been paid early retirement benefits for slightly over six years and had only received five monthly payments of early retirement. *See* Doc. No. 14-1 at PageID 391-93. As a result, resuming his early retirement benefits in 2021—in the monthly amount calculated in July 2014, *see supra*, § I—will significantly reduce the total amount of his single life annuity "payable for life," *id*. at PageID 353, because the monthly amount of those benefits will be spread over a shorter amount—by about six years—of his lifespan.[14] *Cf. Urlaub v. CITGO Petroleum Corp.*, No. 21 C 4133, 2022 WL 523129, at *1 (N.D. Ill. Feb. 22, 2022) ("[A] participant who retires early receives lower monthly pension payments to account for their increased number of post-retirement (and thus pension-receiving) years"). Consequently, the suspension of Moshos's early retirement benefits and the six-year lapse in payment of those benefits negatively affected the actuarial equivalent of his normal retirement

---

[14] This would remain true even if Moshos had stopped engaging in disqualifying employment between ages 55 and 62 because Plan § 4.7(c) required the suspension of his early retirement benefits to continue until he reached his normal retirement date (*i.e.*, the date he turned age 62, *see* Plan § 1.28). *See* Doc. No. 14-1 at PageID 492, 521-22.

benefits, as prohibited by the Suspension Regulation, § 2530.203-3(a), and ERISA's nonforfeitability statute, § 1053(a). The Board's decision lacks any indication it considered this negative effect. *See* Doc. No. 14-1 at PageID 392-93.

Defendants contend that applying the Suspension Regulation and ERISA's nonforfeitability statute without regard to the "'actuarial equivalent' would effectively allow any early retiree in any defined benefit pension plan to reap windfall benefits at any time by participating in a minimal amount of Disqualifying Employment just before his normal retirement age." Doc. No. 24 at PageID 652 (emphasis omitted). This argument lacks merit.

Accepting Defendants' hypothetical, the equivalence between the retiree's normal retirement benefits and the actuarial equivalent of those benefits would remain intact or very nearly so. If, for example, Moshos had continued to work without suspension of his early retirement benefits until slightly before he reached his normal retirement age, resuming payment of his early retirement benefits at his normal retirement age would not significantly reduce the total amount of early retirement benefits he would receive over his lifespan. Consequently, in this hypothetical situation, the brief suspension and resumption of Moshos's early-retirement benefits when he reached retirement age would not result in a windfall of benefits for him, would not negatively affect his normal retirement benefits or their actuarial equivalent, and would not violate the Suspension Regulation or ERISA's nonforfeitability statute.

Defendants contend the plain language of Plan §§ 4.8(a) and (b) prohibits Moshos's attempt to change or adjust his original decision to reduce his selection of early retirement benefits. Doc. No. 24 at PageID 653. Assuming Defendants correctly understand the meaning of Plan §§ 4.8(a) and (b), their application to Moshos's circumstances must comply with ERISA's nonforfeitability statute and the Suspension Regulation. In Moshos's situation, as explained

12

above, and without the benefit of the parties' input regarding *Reichert*, the denial of his application for normal retirement benefits violated these provisions. Plan §§ 4.8(a) and (b) do not overcome or circumvent the requirements of ERISA or the violations identified above.

For all the above reasons, the Board's decision violated ERISA § 1055(a) and the Suspension Regulation and, as a result, was not the result of a deliberate, principled reasoning process but, instead, constituted an arbitrary and capricious decision. *See Glenn*, 461 F.3d at 666 (A decision is not arbitrary and capricious when it "'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" (citation omitted)).

### IV. Conclusion

As noted previously, the Court's analysis herein considers and relies in part on the Sixth Circuit's recent decision in *Reichert v. Kellogg Co.*, __F.4th__, Nos. 24-1442, 24-5945, 2026 WL 734673, at *5 (6th Cir. 2026) without the benefit of briefing by the parties. Because the concerns of due process justify providing the parties with the opportunity to provide such briefing, and because such briefing may change the Court's analysis in this case, the Court **DENIES WITHOUT PREJUDICE** the parties' cross motions on the administrative record. In addition, although there is a possibility that the Court's current analysis and conclusions might need alteration in light of further briefing by the parties, this Order provides much more information to the parties and counsel than they had available during their first attempted mediation. Thus, a second referral of this case to Magistrate Judge Peter B. Silvain, Jr. is warranted and is hereby **ORDERED**. *See* S.D. Civ. R. 16.2 ("[I]n its discretion and at any time during the progress of the case as appear appropriate, the Court may assign any civil case that is not exempted hereunder for one or more mediation conferences").

In the event a second mediation does not resolve this case, each party may file, **within**

13

14

**fourteen days** of the conclusion of mediation, a memorandum addressing *Riechert* and this Order.

        **IT IS SO ORDERED.**

<u>March 20, 2026</u>                            s/*Michael J. Newman*
                                              Hon. Michael J. Newman
                                              United States District Judge